UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 25-mj-179 (GMH) |
| v. : | |
| : | |
| DAMION ALEXANDER PEDDIE, : | |
| : | |
| Defendant. : | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that Defendant Damion Alexander Peddie be detained pending trial, pursuant to 18 U.S.C. §§ 3142(d)(1)(B) (non-citizen charged with felony offense); (f)(1)(C) (serious drug felony); (f)(1)(E) (use or possession of firearm in commission of offense); and (f)(2)(A) (serious risk of flight).

On August 21, 2025, a federal grand jury in Washington, D.C. returned an eight-count indictment in case number 25-cr-241 (TJK), charging Thomas Wilton Hancock, Jr. and seven others, *inter alia*, with conspiring to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of phencyclidine (PCP) and 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv), (b)(1)(A)(vi), and 846, along with multiple substantive firearms and narcotics offenses.

On August 26, 2025, following a coordinated arrest operation, the Defendant, among others, was arrested and charged by criminal complaint with violations of 8 U.S.C. § 1326 (unlawful re-entry of previously removed person); 18 U.S.C. §§ 922(g)(1) (felon in possession of a firearm), 922(g)(5) (unlawfully present person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime); and 21 U.S.C. § 841 (possession with the

intent to distribute a controlled substance). At the Defendant's August 27, 2025 initial appearance, the United States requested his pretrial detention pursuant to 18 U.S.C. §§ 3142(d)(1)(B); (f)(1)(C); (f)(1)(E); and (f)(2)(A). By virtue of the alleged violation of 18 U.S.C. § 924(c), there is a rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3)(B). Separately, by virtue of the Defendant's immigration status, there is an immigration detainer pending with Immigration and Customs Enforcement.

The United States respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pretrial detention of the Defendant.

## **APPLICABLE LAW**

Pursuant to 18 U.S.C. § 3142(e)(3)(B), the Defendant faces a rebuttable presumption that no condition or combination of conditions can effectively ensure his appearance in this case and otherwise protect the community. The United States must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). For a detention decision based upon risk of flight, the United States only need prove by a preponderance of the evidence that there is no condition or combination of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986).

In making the pretrial detention determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Furthermore, at a detention hearing, the United States may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79

F.3d at 1210.

In considering whether there are conditions of release, which will reasonably assure the safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his or her history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). In consideration of these factors, along with the applicable rebuttable presumption, the United States respectfully submits that the Defendant's release poses an unmitigable risk to the community's safety, and he further poses a flight risk.

## SUMMARY OF INVESTIGATION

The indictment in 25-cr-241 (TJK) stems from an investigation into a narcotics trafficking conspiracy in the 2900 block of Knox Place SE. Through various investigative methods, including court-authorized Title III wiretaps of Hancock's phone (Target Telephone 2, or TT2) from April 30 to May 29, 2025,[1] Hancock was identified as a large-scale, Baltimore-based narcotics trafficker selling bulk quantities of fentanyl and other narcotics to Washington, D.C. redistributors like the Defendant. Hancock's intercepted wire communications revealed the Defendant was a redistributor of Hancock's narcotics.

At the conclusion of the investigation, law enforcement executed a coordinated arrest operation on August 26, 2025, resulting in the seizure of 20 firearms; more than two kilograms, in aggregate, of powdered fentanyl, cocaine, and crack cocaine; significant quantities of liquid PCP;

---

[1] The Honorable Randolph D. Moss of the District Court for the District of Columbia authorized the interception of wire communications for TT1, TT2, and TT3, in case numbers 25-wt-01 and 25-wt-02.

3

and approximately $50,000 were recovered. Specifically, during the search of the Defendant's D.C. residence, law enforcement recovered further indicia of his role as a drug trafficker and redistributor of narcotics, including fentanyl and crack cocaine.

## BACKGROUND

On April 30, 2025, interception of Hancock's TT2 commenced. In conjunction with interceptions of Hancock's wire communications, investigative agents sought and obtained a search warrant to search eight iCloud accounts in connection with this investigation, including Hancock's.[2] From TT2 WhatsApp communications, obtained within the iCloud returns from Hancock, investigators learned that Hancock supplied the Defendant with narcotics, believed to be fentanyl based upon general knowledge of Hancock's trafficking and more specific context discussed *infra*. The seized communications began on May 18, 2024, and continued through April 23, 2025, the date of the signed search warrant. Within the communications, law enforcement observed multiple instances of the Defendant apparently requesting narcotics from Hancock.

For example, on March 29, 2025, Hancock sent the below message, depicted in Figure 1, and a video to the Defendant. In the video, a black male sitting in a chair appears to be under the influence of narcotics.[3] Near the end of the video, the FaceTime Video interface appears, showing that the Facetime Video interaction is with "Bro Lip," depicted in Figure 2. In Hancock's contact list, "Bro Lip" is associated with telephone number utilized by Reginald Lassiter, a named defendant in Case No. 25-cr-241 and a D.C.-based redistributor of Hancock's fentanyl.

---

[2] Authorization was obtained on April 23, 2025, in Case No. 25-sc-651, from the Honorable G. Michael Harvey of the District Court for the District of Columbia. Renewed authorization to obtain Hancock's iCloud returns, amongst other targets of this investigation, was granted on August 7, 2025, in Case No. 25-sc-1300 by the Honorable Zia M. Faruqui of the District Court for the District of Columbia. Analysis of the second set of returns is ongoing, and thus, all references to evidence obtained from Hancock's iCloud returns contained within this memorandum are from the first set of iCloud returns.

[3] It is common, both generally for drug traffickers as well as for the specific traffickers in this conspiracy, to use "testers," or members of the community struggling with addiction, to try out new product on in order to determine a particular narcotic's potency. *See, e.g.*, Case No. 25-cr-241, ECF No. 16, at 16, 55.



*Figure 1*



*Figure 2*

5

Interpreted, Hancock shared proof of the effect his product, most likely fentanyl based upon Hancock's intercepted communications from TT2, as well as his iCloud returns, has on a user. Hancock further articulated his ratio of fentanyl and cutting products to the Defendant, which caused the drug user depicted in Figure 2 to have a strong reaction to the drugs ("baked").

On April 20, 2025, Hancock messaged the Defendant: "Wsup big guy how u looking." The Defendant responded with a voice note, stating that there were "no heads around" and "nobody for the down." In other words, Hancock communicated with the Defendant to assess whether the Defendant had a need for narcotics, and the Defendant responded that at the moment, he did not have any buyers for his narcotics, including "down," a common street term for fentanyl or heroin.

### *August 26, 2025 Arrest Operation*

On August 26, 2025, law enforcement conducted a joint operation to execute arrest warrants, issued pursuant to the above-referenced indictment return, and residential warrants in twenty locations across three different judicial districts, including the Defendant's residence at 426 Taylor Street NW. At the time of the search warrant execution, the Defendant was seen walking down the stairs from the second story of the residence, from a room later determined to be his bedroom. Within his residence, law enforcement found and seized:

- H&R 32 S&W Revolver bearing serial number AM23798;
- AR-style pistol, unserialized;
- Hi-Point 9x19 Model 995 9mm carbine rifle bearing serial number F117722;
- .22 caliber revolver bearing serial number 4717;
- 9mm Polymer 80 handgun, unserialized;
- Assorted ammunition, including six magazines;
- Approximately seven pounds of marijuana packaged in vacuum sealed bags;

- One baggie containing approximately 3.5 grams of powdered fentanyl; and
- Approximately four zips of crack cocaine.

During a custodial, post-*Miranda* interview conducted on scene, the Defendant acknowledged possession of the .22 caliber revolver and 9mm ghost gun, each of which were found in his bedroom.

## ARGUMENT

Due to the charged offense, the Defendant is presumptively dangerous under Section 3142(e)(3)(B). Moreover, given his criminal history and residency status, the Defendant presents a flight risk. The United States respectfully submits that the Defendant cannot rebut the presumption in favor of his detention, and there are no conditions of release adequate to reasonably assure the community's safety and his return to Court. Therefore, this Court should detain the Defendant pending trial.

A.    **The Nature and Circumstances of the Offense**

The nature and circumstances of the charged offense weighs strongly in favor of detention. As illustrated by the Defendant's communications with Hancock over the course of the conspiracy, combined with the seizures from his residence, the Defendant is a redistributor of, at minimum, fentanyl, and likely additional narcotics.

As the Court is well-aware, fentanyl specifically is a potent synthetic opioid approved by the Food and Drug Administration for use as an analgesic (pain relief) and anesthetic. It is approximately 100 times more potent than morphine and 50 times more potent than heroin as an analgesic.[4] As reflected in the statutory mandatory minimums for fentanyl distribution, Congress

---

[4] Drug Enforcement Administration, Fentanyl Fact Sheet, https://www.dea.gov/factsheets/fentanyl, (last visited August 28, 2025).

recognized the danger of this particular drug, which is responsible for a national opioid crisis resulting in a considerable increase in fatalities. The statistics regarding the dangers of fentanyl, and its impact in Washington D.C., are staggering. A report issued by the D.C. Office of the Chief Medical Examiner ("OCME"), dated September 19, 2024, shows opioid-related overdoses increased dramatically from 2014 until 2023. As discussed in the report, in 2023, there were 523 opioid-related fatal overdoses with an average of 43 deaths per month.[5] While the term "opiates" include fentanyl and its analogs, morphine, heroin, and other types of drugs, the OCME also discovered that in 2023, over 96% of these overdose deaths involved fentanyl.[6] Beyond D.C., fentanyl continues to have a devastating impact on the local and national community. According to the Drug Enforcement Administration, "[m]ore than 107,000 people lost their lives to a drug overdose in 2023, with nearly 70 percent of those deaths attributed to opioids such as fentanyl."[7]

Independent of the Defendant's drug trafficking, and despite being a convicted felon at least five times over, the Defendant kept a small weapons cache in the residence he shared with his domestic partner and two juveniles. This Defendant's possession of these firearms alone fundamentally threatens this community's safety, as this Court has repeatedly warned against discounting the inherent danger associated with loaded guns. *See United States v. Blackson*, 2023 WL 1778194, at *7-8 (D.D.C. Feb. 6, 2023) (Howell, C.J.) (the absence of evidence of "use" "does little to detract from" the danger posed by a loaded firearm), *aff'd* 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). That danger is particularly acute here because of how the firearms were stored—

---

[5] *See* D.C. Office of the Chief Medical Examiner, Opioid-related Fatal Overdoses: January 1, 2018 to June 30, 2024 (September 19, 2024), https://ocme.dc.gov/sites/default/files/dc/sites/ocme/Opioid-Related%20Fatalities_Sep2024.pdf (last visited July 16, 2025).

[6] *Id.*

[7] Drug Enforcement Administration, Overdose Deaths Decline, Fentanyl Threat Looms (December 16, 2024), https://www.dea.gov/press-releases/2024/12/16/overdose-deaths-decline-fentanyl-threat-looms#:~:text=More%20than%20107%2C000%20people%20lost,to%20opioids%20such%20as%20fentanyl. (last visited July 16, 2025).

8

throughout the residence, none with any degree of security such as a weapons safe, and all easily accessible to either of the juveniles present in the residence.

## B. The Weight of the Evidence Against the Defendant

The weight of the evidence as to at least three of the charges lodged against the Defendant is incontrovertible. With respect to the Defendant's unlawful re-entry, his four prior convictions and most recent supervised release violation in District of Columbia Case No. 13-cr-69 leave no doubt as to his guilt of this offense. Similarly, the Defendant admitted to possessing at least two of the five firearms discovered in his residence, providing strong evidence of the two offenses alleged in violation of Section 922.

Regarding the narcotics violation and corresponding third firearms charge, again, the evidence is strong. Lawfully obtained communications from TT2 show the Defendant unequivocally discussing the redistribution of narcotics with Hancock—the lead defendant in 25-cr-241 (TJK), and the upstream supplier of fentanyl and PCP to the co-defendants in that case. In that case, Hancock supplied bulk quantities of fentanyl to Eric Prather, a prolific fentanyl and PCP dealer in the 2900 block of Knox Place SE. So, too, here, the Defendant's messages with Hancock evinced a similar relationship insofar as Hancock provided the Defendant with controlled substances, the two discussed specific methods and approaches for how to mix and otherwise package the narcotics, and the Defendant ultimately sold these narcotics to his own customer base.

The evidence recovered at the Defendant's residence on August 26, 2025, confirmed the reasonable inference from the communications that the Defendant worked together with Hancock and perhaps additional members of the alleged conspiracy, including Lassiter, to redistribute narcotics in and around the District. Indeed, the tell-tale signs of distribution, including bulk vacuum-sealed bags of marijuana, smaller zips of crack cocaine, and a baggie of powdered

fentanyl, the narcotic about which the Defendant corresponded with Hancock were all discovered in the Defendant's residence.

As this Court has noted, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194 at *10. Because that is true here, the strength of the evidence against the Defendant favors detention

### C. The History and Characteristics of the Defendant

The Defendant's criminal history is extensive, comprehensive, and is so overwhelming that it can justify detention independent of the other Bail Reform Act factors (which also caution in favor of detention). The United States notes that the conduct alleged in the complaint is not aberrational in light of the Defendant's criminal history, which includes a prior conviction for the attempted distribution of cocaine.

Nevertheless, what bears most emphasis is that the Defendant has been convicted of unlawfully re-entering the country on three different occasions in this Court (along with at least his most recent supervised release violation before the Honorable Rudolph Contreras in Case No. 13-cr-69, which was at least the Defendant's fourth illegal re-entry). He has also been found to have unlawfully re-entered the country by the District of Maryland, Greenbelt Division, in Case No. 8:95-cr-366. This pattern of behavior ends the inquiry as to whether the Court is able to fashion any conditions to ensure the Defendant's compliance during pre-trial release.

### D. The Danger to the Community

The United States respectfully submits that the Defendant poses a danger to the community. The presumption under Section 3142(e)(3)(A) establishes that narcotics trafficking is an "inherently dangerous activity." *See United States v. Bethea*, 763 F. Supp. 2d 50, 54 (D.D.C. 2011) (Lamberth, C.J.). Here, the Defendant maintained a stash of the various products he peddles to the community, along with a small cache of weapons to secure his stash, all in a home occupied by multiple children. The Defendant's conduct is inherently dangerous, both to the community and to the occupants of his household.

### CONCLUSION

For the reasons noted above, the United States respectfully submits that no condition or combination of conditions will reasonably assure the safety of the community and the Defendant's return to court. Accordingly, the United States respectfully requests that the Court grant the United States' motion to detain the Defendant pending trial in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ Matthew W. Kinskey*
MATTHEW W. KINSKEY
SITARA WITANACHCHI
JOHN PARRON
D.C. Bar No. 1031975 (Kinskey)
D.C. Bar No. 1023007 (Witanachchi)
PA Bar No. 324503 (Parron)
Assistant United States Attorneys
Violent Crime & Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530

## **CERTIFICATE OF SERVICE**

    I hereby certify that on September 1, 2025, a copy of the foregoing Memorandum in Support of Pretrial Detention was submitted via CM/ECF, which will transmit to counsel for the above-captioned Defendant.

*/s/ Matthew W. Kinskey*
Assistant U.S. Attorney